1
2
3
4
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  In re: AutoZone, Inc., Wage and Hour          No.: 3:10-md-02159-CRB
                                                  Hon. Charles R. Breyer
12  Employment Practices Litigation

13                                                **ORDER DENYING PLAINTIFF'S
                                                  MOTION FOR PARTIAL SUMMARY**
14  _____/              **JUDGMENT;
                                                  GRANTING IN PART AND DENYING**
15                                                **IN PART DEFENDANT'S MOTION
                                                  FOR PARTIAL SUMMARY**
16                                                **JUDGMENT;
                                                  DENYING PLAINTIFF'S MOTION**
17                                                **TO STRIKE;
                                                  DENYING AS MOOT DEFENDANT'S**
18                                                **MOTION TO STRIKE;
                                                  GRANTING MOTION TO**
19                                                **DECERTIFY;
                                                  GRANTING MOTION TO REMAND**

20

21

22          This is a wage and hour case involving California Autozone stores.  In December

23  2012, this Court certified a Rest Break class, defined as: "All non-exempt or hourly paid

24  employees who have been employed at Defendant's retail stores in the State of California at

25  any time on or after July 29, 2005 until the date of certification."  See Order re Class Cert.

26  (dkt. 174).  The Court denied certification "as to all other subclasses."  Id. at 1.  Three and a

27

28  half years and much discovery later, Plaintiffs have moved for partial summary judgment,

see P MSJ (dkt. 289), Autozone has moved for partial summary judgment, see D MSJ (dkt. 282), the parties have each filed motions to strike in connection with the summary judgment motions, see P Mot. to Strike (dkt. 306); D Mot. to Strike (dkt. 312), Autozone has moved to decertify the rest break class, see Mot. to Decertify (dkt. 264), and Plaintiff Jesus Lozacruz has moved to remand his case only, see Mot. to Remand (dkt. 309). The Court found this matter suitable for resolution without oral argument, pursuant to Civil Local Rule 7-1(b), and ruled from the bench at the motion hearing, see Minutes (dkt. 324). The Court promised the parties that it would set forth its reasoning in a written order. Id.

# I.    DISCUSSION

This order will address (A) the cross-motions for partial summary judgment, along with the related motions to strike, followed by (B) the motion to decertify and (C) the motion to remand.

## A.    Cross-Motions for Partial Summary Judgment

The parties each move for partial summary judgment: Plaintiffs move as to the certified rest break claim, while Autozone moves as to the remainder of the claims, which are uncertified.

### 1.    Legal Standard

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A principal purpose of the summary judgment procedure is to isolate and dispose of factually unsupported claims. See Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986). The burden is on the moving party to demonstrate that there is no genuine

dispute with respect to any material fact and that it is entitled to judgment as a matter of law. Id. at 323.  A genuine issue of fact is one that a trier of fact could reasonably resolve in favor of the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is "material" only if it could affect the outcome of the suit under the governing law. Id. at 248–49.

If the moving party does not satisfy its initial burden, the nonmoving party has no obligation to produce anything and summary judgment must be denied.  Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102–03 (9th Cir. 2000).  If, on the other hand, the moving party has satisfied its initial burden of production, then the nonmoving party may not rest upon mere allegations or denials, but instead must produce admissible evidence showing that there is a genuine issue of material fact for trial.  Id. at 1103.  The nonmoving party must "designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  If the nonmoving party fails to make this showing, the moving party is entitled to judgment as a matter of law.  Id. at 323.

It is not a court's task "to scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal citation omitted).  Rather, a court is entitled to rely on the nonmoving party to "identify with reasonable particularity the evidence that precludes summary judgment."  See id.  However, when deciding a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor.  Anderson, 477 U.S. at 255; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

//

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

### 2.     Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs move for summary judgment on their rest break claim.  See P MSJ.[1] Because there is at best a genuine dispute of material fact as to whether Autozone indeed had a uniform policy in place throughout the class period, summary judgment is inappropriate.

Wage Order No. 7 provides in part that an "authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof."  8 Cal. Code of Regs. § 11070, subd. 12(A).  The Supreme Court of California clarified in Brinker Restaurant Corp. v. Superior Court, 53 Cal. 4th 1004, 1029 (2012), that "[e]mployees are entitled to 10 minutes' rest for shifts from three and one-half to six hours in length, 20 minutes for shifts of more than six hours up to 10 hours, 30 minutes for shifts of more than 10 hours up to 14 hours, and so on."  In seeking certification of the rest break class here, Plaintiffs identified an Autozone policy, which they represented was in place throughout the class period.  Order on Order re Class Cert. at 6–7.  That policy provided:

> An AutoZoner who works 4 hours per day is provided 1 break period of 10 consecutive minutes; an AutoZoner who works 8 hours per day is provided 2 break periods of not less than 10 consecutive minutes.

Id. at 7.  That policy is—on its face—inadequate under Brinker.  See id. at 11.

The Court noted at the class certification stage that there were "significant evidentiary disputes in connection with [Autozone's] interpretation and implementation of this policy."

---

[1] Plaintiff also move, in the alternative, for the Court to determine under Federal Rule of Civil Procedure 56(g) that certain material facts are not disputed.  Id. at 9–10.  For the reasons the Court denies summary judgment on this claim, it also declines to find that the facts Plaintiffs seek to have the Court deem undisputed are in fact undisputed.

United States District Court
For the Northern District of California

Id. at 7.  The Court discussed the conflicting evidence, but held that, because the "claims are

based entirely on the legality of [Autozone's] uniform written rest break policy," common

questions predominated.  Id. at 13–14 (citing Kurihara v. Best Buy Co., No. 06-01884 MHP,

2007 U.S. Dist. LEXIS 64224, at *6 (N.D. Cal. Aug. 30, 2007); Brinker, 53 Cal. 4th at 1020,

1033; Vedachalam v. Tata Consultancy Servs., Ltd., No. C 06-0963 CW, 2012 U.S. Dist.

LEXIS 46429, at *37–39 (N.D. Cal. Apr. 2, 2012); In re Taco Bell Wage & Hour Actions,

No. 1:07CV1314 LJO DLB, 2012 WL 5932833, at *6 (E.D. Cal. Nov. 27, 2012)).

Plaintiffs' motion now argues that the uniform policy "is sufficient to establish

liability," and that if Autozone can demonstrate that some employees actually took

appropriate rest breaks, then such evidence is relevant to assessing damages, not liability.  P

MSJ at 8 (citing Faulkinbury v. Boyd & Assocs., Inc., 216 Cal. App. 4th 220, 235 (2013);

Benton v. Telecom Network Specialists, Inc., 220 Cal. App. 4th 701 (2013)).  Even Plaintiffs

concede, however, that simply pointing to a written policy does not entitle a plaintiff to

summary judgment.[2]  See Brinker, 53 Cal. 4th at 1033 (emphasis added) (referring even in

certification context to "uniform policy consistently applied"); Campbell v. Vitran Express,

Inc., No. CV 11-05029 RGK (SSx), 2016 U.S. Dist. LEXIS 31360, at *9 (C.D. Cal. Mar. 2,

2016) ("logically absurd and legally erroneous" to argue that liability attaches "solely based

on a facially defective policy."); Reply re P MSJ (dkt. 305) ("Campbell . . . denied summary

judgment where plaintiff argued that the existence of facially defective policies warrants

liability.  That is not Plaintiffs' argument here.  Rather, in addition to the facial illegality . . .

---

[2] As Autozone argues, Plaintiffs' argument "presumes that once certification is established then liability is automatically established.  If this were the case, then every single class certified would automatically be granted summary judgment."  Opp'n to P MSJ (dkt. 302) at 11.

Defendant's corporate designee and other corporate witnesses confirmed that Defendant actually used the unlawful policies throughout the entire class period.").

Autozone, in opposing the motion, has successfully cast doubt on whether the written policy Plaintiffs point to—the one that was the basis of the Court's certification order in 2012—was actually used throughout the class period.

First, it turns out that at the beginning of the class period, in July 2005, Autozone's 2004 California Store Handbook was in effect, and it provided that "[rest] breaks are scheduled in accordance with California law." See Opp'n to P MSJ at 2 (citing 2012 Jon Decl. (dkt. 128) ¶ 8, Ex. A; 2016 Jon Decl. (dkt. 264-1) ¶ 3, Ex. A). In addition, Wage Order No. 7 was posted in each store. Id. (citing 2016 Jon Decl. ¶¶ 6–7; Stephens Decl. (dkt. 264–2) ¶¶ 3–4; Iskander Decl. (dkt. 264-3) ¶ 3, Ex. 2. Autozone revised that handbook in 2006, and it again provided that "[rest] breaks are scheduled in accordance with California law." Id. (citing 2012 Jon Decl. ¶ 8, Ex. A; 2016 Jon Decl. ¶ 3, Ex. A). The Wage Order continued to be posted in each store. Id. (citing 2016 Jon Decl. ¶¶ 6–7; Stephens Decl. ¶¶ 3–4; Iskander Decl. ¶ 3, Ex. 2). The language Plaintiffs rely on, from the 2008 "Store Handbook Exception, California," was not implemented until 2008. See Opp'n to P MSJ at 3 (citing 2016 Jon Decl. ¶ 4, Ex. B; 2012 Jon Decl. ¶ 8, Ex. A).[3] That is three years into the class period.

Second, in 2011, and thus before the end of the class period, an Autozone PowerPoint presentation explained that any employee who worked between 3.5 and 6 hours was entitled

---

[3] Autozone also asserts that the Wage Order continued to be posted in stores, and that "Plaintiffs are unable to cite to any evidence that the allegedly deficient Exceptions policy constituted a change in Defendant's policy, or that it was intended to supplant the Wage Orders posted in each store." Id.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

to a rest break, and that any employee who worked between 6 and 10 hours was entitled to two.  Supplemental 2016 Jon Decl. (dkt. 298) ¶¶ 2–3[4]; 2016 Jon Decl. Ex. C.  This policy complies with Brinker.  See Brinker, 53 Cal. 4th at 1029.  As Plaintiffs point out, it is unclear whether Autozone "actually gave the presentation to any of its employees during, or after, the Rest Break Class Period."  See Reply re P MSJ at 4.  Nonetheless, the Court is to view the evidence in the light most favorable to the nonmoving party—here, Autozone—which would support an inference that Autozone did not create a PowerPoint and then do nothing with it.  See Anderson, 477 U.S. at 255.

Third, Autozone points to some evidence that the various policies in place during the class period were implemented in a compliant matter: Carlos Jon declares that there was a 2-hour rule, see 2012 Jon Decl. ¶ 9 ("it is the expectation that at California stores, AutoZoners will take rest breaks every two hours."); various employee deponents, including a named Plaintiff, testified that they took rest breaks or told their subordinates to take rest breaks every two hours, see Iskander Decl. ¶¶ 4, 6–7, Ex. 3, 5, 6; 117 class members declared that they knew that they were entitled and permitted to take rest breaks if they worked over 3.5 or 6 hours, see Order re Class Cert. at 8–9; and Plaintiffs' own survey evidence (discussed below in the context of the motion to decertify) reflected that "a majority of the survey respondents stated that they were in fact authorized and permitted to take all required rest breaks during shifts of 3.5–4 and 6–8 hours," Opp'n to P MSJ at 6 (citing Wazzan Report

---

[4] This declaration clarified that the PowerPoint was created in August 2011, not August 2012.  See Supplemental 2016 Jon Decl. ¶ 2.

(dkt. 287); Saad Decl. (dkt. 300-1) ¶ 3, Ex. A).[5]

Plaintiffs move to strike the new evidence that Autozone did not implement the unlawful policy language until 2008.  See P Mot. to Strike.  Autozone clarified in its opposition brief that, "Due to the ambiguous nature of the copyright statement, Defendant's 30(b)(6) deponent Tim Young mistakenly testified that the 2010 Exception was in effect from 2004 to 2010, when in fact the policy was not even introduced until 2010."  See Opp'n to P MSJ at 3 n.4 (citing Young Depo. (dkt. 289-1) Ex. E at 31).  Plaintiffs argue that Autozone cannot rebut Young's 30(b)(6) deposition testimony, because Plaintiffs relied on it and because Autozone has not provided an adequate explanation for Young's change of course.  P Mot. to Strike at 3.  But Autozone does offer an adequate explanation.  The policies that Young was given during his 30(b)(6) deposition had copyright statements in the corner that state a range of dates.  See 2016 Young Decl. (dkt. 300-2) ¶ 4.  Young mistakenly agreed with Plaintiffs' counsel's questions that the date range represented the entire time the policy was in effect.  Id. ("For example, Plaintiffs' counsel asked if Exhibit 3 was 'in effect for Autozone's California employees from the period that is stated at the bottom, which is 2004 to 2010?'  However, I also testified that I did not know when Exhibits 4 and 5 came into effect, and I stated that my testimony with respect to Exhibit 3 was 'based off [the] document.'").  Young explains:

> Looking back at the documents now, it is clear that the copyright information
> in the lower left corner, to which Plaintiffs' counsel referred, does not represent

---

[5] The survey results were phrased in the negative: 25% of short shift employees stated that they were not authorized and permitted to take a rest break; 29% of mid-shift employees stated that they were not authorized and permitted to take two rest breaks; and 38% of long shift employees stated that they were not authorized and permitted to take three rest breaks.  See Saad Decl. ¶ 3.

the period during which the documents were in effect.  If that were true, then as of 2008 all four of the handbooks identified above would have simultaneously been in effect.[6]  Instead, as Exhibit 9 makes clear, the <u>last</u> date in the copyright notice represents the year in which the particular handbook or exception first became effective.

<u>Id.</u> ¶ 5.

The Court agrees that this is the appropriate interpretation of the copyright statements. Moreover, although Plaintiffs are frustrated by Young's late clarification, <u>see</u> P Mot. to Strike, it is nonetheless adequate, <u>see</u> <u>AngioScore, Inc. v. TriReme Med., Inc.</u>, No. 12-cv-03393-YGR, 2015 WL 4040388, at *24 (N.D. Cal. July 1, 2015) (collecting cases in support of rule that defendant cannot rebut 30(b)(6) testimony without an "adequate explanation"). Accordingly, the Court DENIES Plaintiffs' motion to strike and permits Young's clarifying testimony about the dates during which various policies were in effect.[7]

Because there is at least a dispute of fact as to whether the rest break policy upon which this Court granted class certification was in effect throughout the class period, the Court DENIES Plaintiffs' motion for partial summary judgment as to the rest break claim.[8]

//

---

[6] Autozone also notes that under Plaintiffs' theory, the 2013 handbook, which has a date range of 2004–2013, would govern the entire class period, which would be problematic for Plaintiffs as the policy in the 2013 handbook appears to be lawful.  <u>See</u> Opp'n to P Mot. to Strike (dkt. 311) at 7.

[7] Autozone's motion to strike argues that Plaintiffs' motion to strike is procedurally improper because Local Civil Rule 7-3 requires any objections to evidence to be included in a brief.  <u>See</u> D Mot. to Strike.  Autozone is correct, but because the Court denies Plaintiffs' motion to strike on the merits, it DENIES Autozone's motion to strike as moot.

[8] The Court also rejects Plaintiffs' last ditch request to have the Court grant summary judgment on the rest break claim at least as to 2008 to 2012.  <u>See</u> Reply re P MSJ at 3–4.  First, the PowerPoint presentation was from 2011.  <u>See</u> Supplemental 2016 Jon Decl. ¶ 2.  Second, there remains a dispute of fact as to whether the unlawful "rest breaks every 4 hours" policy was actually used from 2008 to 2011; it is not enough merely to point to a written policy.  <u>See</u> Campbell, 2016 U.S. Dist. LEXIS 31360, at *9.  Third, Plaintiffs' expert report spans the entire class period and cannot obviously be truncated. <u>See</u> Wazzan Report at 4.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

### 3.    Autozone's Motion for Partial Summary Judgment

Autozone moves for partial summary judgment on the remaining, uncertified claims. See D MSJ.  This order addresses: (a) Plaintiffs' class-wide claims, and Ellison's individual claims, under the Private Attorneys General Act of 2004, Labor Code § 2699 et seq. ("PAGA"); (b) Plaintiffs' class-wide claims, and Ellison's individual claims, under Labor Code section 558; (c) the portion of Plaintiffs' individual waiting time penalties under Labor Code section 203 that is based on an alleged failure to pay rest break premiums, and the class-wide claim for waiting time penalties under Labor Code section 203; and (d) the portion of Plaintiffs' individual claims, and the class-wide claim, for prejudgment interest under Labor Code section 218.6 based on rest break premiums and waiting time penalties.

### a.    PAGA claims

Autozone argues that Plaintiffs' PAGA claims fail because (1) there is no certified PAGA class and (2) there is no representative PAGA claim in the operative complaint.  D MSJ at 1.  This is correct.  Plaintiffs cannot continue to seek recovery on a class-wide basis for penalties under PAGA.

The Court denied certification "as to all other subclasses" but the rest break class, and so there is no PAGA class in the case.  See Order re Class Cert. at 1.  Nor is there a PAGA claim in the complaint.  In February 2007, Ellison filed a motion for leave to amend his complaint to add a separate PAGA claim.  Iskander Decl. Ex. B.  Autozone did not oppose the amendment and Plaintiffs filed the First Amended Complaint in April 2007.  Iskander Decl. ¶ 3; Iskander Decl. Ex. C.  In May 2007, Ellison filed another motion to amend, seeking to remove the separate cause of action under PAGA.  Iskander Decl. Ex. D.

Autozone did not oppose amendment and the Court granted the motion in July 2007.

Iskander Decl. ¶ 5; Iskander Decl. Ex. E.  Subsequently a dispute arose about whether any

PAGA claims remained at issue following the Court's denial of a PAGA subclass.  Iskander

Decl. Ex. H.  In May 2015, Plaintiffs filed a motion to amend to add a representative PAGA

claim.  Iskander Decl. Ex. J.  This Court denied that request, explaining that the Second

Amended Complaint had "removed the separate cause of action under PAGA," and that

permitting Plaintiffs to add a representative PAGA claim eight years after the original

complaint had been filed constituted "undue delay" and would prejudice Autozone.

See Order Denying Mot. For Leave to Amend (dkt. 231) (adding, "Defendant and the Court

have operated on the understanding that the Second Amended Complaint is the operative

complaint in this case . . . and that, following the Court's order on class certification, this

case is primarily about rest breaks.").[9]  As there is no PAGA claim left in the case, the Court

GRANTS summary judgment to Autozone as to representative PAGA penalties.

### b.       Labor Code section 558

Autozone next asserts that "only 'the Labor and Workforce Development Agency

[LWDA] . . . and its constituent departments and divisions—are authorized to assess and

collect civil penalties for specified violations of the Labor Code committed by the

employer,'" and that "PAGA is the only exception to this rule."  See D MSJ at 8 (citing

Caliber Bodyworks, Inc.  v. Super. Ct., 134 Cal. App. 4th 365, 370 (2005); Arias v. Super.

Ct., 46 Cal. 4th 969, 986 (2009)).  Plaintiffs seek to recover penalties under Labor Code

_____

[9] This language refutes Plaintiffs' assertion that "contrary to Defendant's argument, there is a representative PAGA claim pled in the Second Amended Complaint."  See Opp'n to D MSJ (dkt. 301) at 8.

section 558 as part of their PAGA claim.  <u>See</u> Iskander Decl. Ex. E (SAC ¶¶ 51, 57, 78, 87).

Autozone argues that because Plaintiffs cannot maintain a PAGA claim, they are also not

entitled to penalties under section 558.  D MSJ at 8.  Plaintiffs argue simply: "Because

PAGA claims remain available in this case, Section 558 penalties survive."  Opp'n to D MSJ

at 9.  Because the Court concludes that the PAGA claims are no longer available, the Court

GRANTS summary judgment to Autozone as to the section 558 penalties.

<strong>c.   Individual and Class-Wide Waiting Time Penalties under</strong>

<strong>Labor Code section 203</strong>

Autozone next argues that Plaintiffs are not entitled to waiting time penalties under

Labor Code section 203 because section 203 provides for such penalties where an employer

willfully failed to pay "any wages of an employee . . ." and unpaid rest breaks are not

"wages."  <u>See</u> D MSJ at 9.  Despite Autozone's assertion that the law is "well established" in

its favor, this is in fact an area in which courts are sharply divided.  <u>See</u> <u>Brewer v. General</u>

<u>Nutrition Corp.</u>, No. 11-cv-3587 YGR, 2015 WL 5072039, at *18 (N.D. Cal. Aug. 27, 2015)

(collecting cases re split).  This Court joins the majority of judges in this district and

concludes that unpaid rest breaks are "wages" entitling Plaintiffs to waiting time penalties

under section 203.

The California Supreme Court in <u>Murphy v. Kenneth Cole Prods., Inc.</u>, 40 Cal. 4th

1094, 1114 (2007), considered the appropriate statute of limitations for a claim under the rest

break statute, Labor Code section 226.7.  It held that "[t]he statute's plain language, the

administrative and legislative history, and the compensatory purpose of the remedy compel

the conclusion that the 'additional hour of pay' . . . is a premium wage intended to

12

**United States District Court**
For the Northern District of California

compensate employees, not a penalty." Id.  That same court then muddied the waters when, five years later, it again spoke about the rest break statute.  In Kirby v. Immoos Fire Protection, Inc., 53 Cal. 4th 1244, 1248 (2012), the court was applying Labor Code section 218.5, which requires the awarding of attorneys' fees to the prevailing party in "any action brought for the nonpayment of wages. . . ."  The court had to determine "whether a section 226.7 claim, which concerns an employer's alleged failure to provide statutorily mandated meal and rest periods, constitutes an 'action brought for the nonpayment of wages' within the meaning of section 218.5." Id. at 1255.  It held that "a section 226.7 claim is not an action brought for nonpayment of wages; it is an action brought for nonprovision of meal or rest breaks." Id. at 1256–57.  The court explained that this was "not at odds with" the Murphy decision:

> We said that the "additional hour of pay" remedy in section 226.7 is a "'liability created by statute'" and that the liability is properly characterized as a wage, not a penalty. . . . To say that a section 226.7 remedy is a wage, however, is not to say that the legal violation triggering the remedy is nonpayment of wages.  As explained above, the legal violation is nonprovision of meal or rest breaks, and the object that follows the phrase "action brought for" in section 218.5 is the alleged legal violation, not the desired remedy.

Id. at 1257.

Courts post-Kirby have struggled to decide whether penalties for violating section 226.7 are still properly considered "wages," under Murphy, or whether Kirby's holding that a claim for violation of section 226.7 is not an action for nonpayment of wages means that the relief under section 226.7 is something other than wages.  See, e.g., Brewer, 2015 WL 5072039, at *18.  Although some courts have concluded that payments under section 226.7 should not be considered wages, see, e.g., Singletary v. Teavana Corp., No. 5:13-cv-01163-

PSG, 2014 WL 1760884, at *4 (N.D. Cal. Apr. 2, 2014) (concluding that "Section 203, like the attorney fee provision in <u>Kirby</u>, is concerned with a particular type of wrong, not a particular type of remedy"); <u>Jones v. Spherion Staffing LLC</u>, No.  LA CV 11-06462 JAK (JCx), 2012 U.S. Dist.  LEXIS 112396, at *21–22 (C.D. Cal. Aug. 7, 2012) (reading <u>Murphy</u> narrowly and applying <u>Kirby</u>), this Court is persuaded that the courts reaching the opposite conclusion employ better reasoning.  Judge Gonzales Rogers examined <u>Murphy</u> and <u>Kirby</u> at length and concluded that the payments are wages, stating: "<u>Kirby</u> did not abrogate <u>Murphy</u>." <u>See</u> <u>Brewer</u>, 2015 WL 5072039, at *18–19.[10]  Judge Tigar discussed the relevant case law in <u>Parson v.  Golden State FC, LLC</u>, No. 16-cv-00405-JST, 2016 WL 1734010, at *3–5 (N.D. Cal. May 2, 2016), distinguished <u>Singletary</u> and <u>Jones</u> as making distinctions that have no legal bearing,[11] and concluded that payments under section 226.7 are wages, as "[n]othing in <u>Murphy</u> or <u>Kirby</u> suggests that wages awarded under section 226.7 be treated any differently than other wages earned by the employee."  Judge Corley, too, was "not persuaded" by the defendant's argument that <u>Kirby</u> precludes a finding that section 226.7 payments are wages, stating "while <u>Kirby</u> is helpful in determining the contours of a Section 226.7 claim, it says nothing particular to the question of whether a Section 226.7 premium wage is a wage under Section[] 203. . . ."  <u>See</u> <u>Bellinghausen v. Tractor Supply Co.</u>, No. C-13-02377 JSC, 2014

---

[10]   That opinion also cited a recent Internal Revenue Chief Counsel Advisory Letter stating that payments under section 226.7 "would be wages for federal employment tax purposes." <u>Id.</u> at *19 n.13.

[11] Judge Tigar explained: "It is true that the violation described in section 203 . . . is concerned with the improper payment of wages, while the violation described in section 226.7 is not.  However, it is unclear why this distinction resolves the issue.  If the amounts due are classified by law as wages and are not properly paid to the employee . . . , the employer has presumably committed a violation—regardless of whether the wages are owed to the employee due to hours of labor, additional overtime pay, an award under California law, or some other reason." <u>Id.</u> at *5.

United States District Court
For the Northern District of California

1    WL 465907, at *7 (N.D. Cal. Feb. 3, 2014).[12]

2        Autozone relies on the opinion in Ling v. P.F. Chang's China Bistro, Inc., 245 Cal.

3    App. 4th 1242 (2016).  See D MSJ at 9; Reply re D MSJ (dkt. 304) at 7 n.5.  Although that

4

5    case included broad language about section 203, see Ling, 245 Cal. App. 4th at 1261

6    ("Following Kirby, section 226.7 cannot support a section 203 penalty because section 203,

7    subdivision (b) tethers the waiting time penalty to a separate action for wages."), that

8

9    language is dicta.  The Ling case concerned only whether "a section 203 waiting time claim

10   based on section 226.7 premium pay is an 'action [] brought for the non-payment of wages'

11   under section 218.5"—the attorneys' fees provision at issue in Kirby.  See id.  Its assertion

12

13   that "the fact that the remedy [under section 226.7] is measured by an employee's hourly

14   wage does not transmute the remedy into a wage as that term is used in section 203," is

15   neither central to its holding nor, if read as Autozone urges, consistent with Murphy.  See id.

16

17        Because the Court is persuaded by the numerous Northern District courts recognizing

18   that section 203 penalties are available for wage payments under section 226.7, the Court

19   DENIES summary judgment to Autozone on Section 203.[13]

20

21

22        [12] Judge Corley, like Judge Tigar, was "not persuaded by Jones."  Id.   However, she ruled
     simply that "[g]iven the uncertainty in the caselaw," she could not conclude that the plaintiffs' claims
23   failed as a matter of law.  Id. at *9.

24        [13] The Court also rejects Autozone's argument that the waiting time penalties are no longer part
     of the case because the Court did not certify a Late Payment Class.  See D MSJ at 10–11.  The claim
25   for penalties under Section 203 is derivative of the rest break claim, see Opp'n to D MSJ at 15 (citing
     P Mot. for Class Cert. (dkt. 95-1) at 3 (alleging "rest break . . . violations, as well as derivative claims
26   alleging the late payment of wages")); see also Chavez v. Lumber Liquidators, Inc., No. CV-09-4812
     SC, 2012 WL 6115611, at *2 (N.D. Cal. Dec. 10, 2012) (section 203 claims co-extensive with the wage
27   claim on which they were based, and "[t]o the extent that Plaintiff can succeed on this claim, certain
     class members may be entitled to additional compensation under section 203.").  Autozone does not
28   really disagree.  See Reply re D MSJ at 8 ("There is therefore no basis for class-wide recovery of
     waiting time penalties, except to the extent that the Section 203 claim is premised on the claims of the
     sole certified class (i.e. missed rest breaks)."

United States District Court
For the Northern District of California

### d.      Individual and Class-Wide Prejudgment Interest under Labor Code section 218.6

Finally, Autozone argues that it is entitled to summary judgment on Plaintiffs' claims for prejudgment interest under Labor Code section 218.6 based on either (1) unpaid rest break premiums or (2) waiting time penalties.  D MSJ at 11.  Section 218.6 provides that "In any action brought for the nonpayment of wages, the court shall award interest on all due and unpaid wages at the rate of interest specified in subdivision (b) of Section 3289 of the Civil Code. . . ."  Cal. Lab. Code § 218.6.  Autozone is correct.[14]

A prerequisite for prejudgment interest under Section 218.6 is that the action be one "for the nonpayment of wages"—and Kirby explicitly held that a rest break claim is not an "action brought for the nonpayment of wages," see Cal. Lab. Code § 218.6; Kirby, 53 Cal. 4th at 1255.  Waiting time penalties also cannot form the basis for prejudgment interest because such penalties are not wages.  In Drumm v. Morningstar, Inc., Judge Henderson explained that "[t]he purpose of prejudgment interest 'is . . . to make the plaintiff whole as of the date of the injury.'"  695 F. Supp. 2d 1014, 1022 (N.D. Cal.  2010) (quoting Lakin v. Watkins Assoc. Indus., 6 Cal. 4th 644, 663 (1993)).  He explained that "The waiting time penalty, like a punitive damage award, is designed not to make employees whole, but to act 'as a disincentive to employers who are reluctant to pay wages in a timely manner.'"  Id. at 1019 (quoting Mamika v.  Barca, 68 Cal. App. 4th 487, 493 (Cal. Ct. App. 1998)).

---

[14] Plaintiffs also argue in their opposition brief that they are entitled to prejudgment interest under California Civil Code section 3287(a) and 3287(b).  Opp'n to D MSJ at 17–20.  The Court does not reach this question, as Autozone did not move for summary judgment as to Plaintiffs' entitlement to prejudgment interest based on section 3287, see D MSJ at 11 (arguing only about prejudgment interest under Labor Code section 218.6).

Accordingly the Court GRANTS Autozone's motion as to prejudgment interest under Labor Code section 218.6.

### 4. Conclusion as to Cross-Motions for Partial Summary Judgment

Therefore, the Court DENIES Plaintiffs' Motion for Partial Summery Judgment, DENIES Plaintiffs' Motion to Strike, DENIES AS MOOT Autozone's Motion to Strike, GRANTS Autozone's Partial Motion for Summary Judgment as to the PAGA claims, the section 558 penalties, and the prejudgment interest under section 218.6; and DENIES Autozone's Partial Motion for Summary Judgment as to section 203.

### B. Motion to Decertify Rest Break Claim

Autozone next moves to decertify the rest break claim, arguing based on Federal Rule of Civil Procedure 23(b)(3) that there is a lack of predominance and that the case is unmanageable. See Mot. to Decertify. The Court agrees on both points.

### 1. Background

In December of 2012, the Court certified a rest break class, defined as: "All non-exempt or hourly paid employees who have been employed at Defendant's retail stores in the State of California at any time on or after July 29, 2005 until the date of certification." Order re Class Cert. at 6.

The Court premised its ruling on its understanding that "[t]hroughout the relevant time period, Defendant had a written rest break policy, applicable to all California AutoZone stores, which provided" that "an AutoZoner who works 4 hours per day is provided 1 break period of 10 consecutive minutes; an AutoZoner who works 8 hours per day is provided 2 break periods of not less than 10 consecutive minutes." Id. at 6–7. The Court determined

that Autozone's written policy was akin to the policy in <u>Brinker</u>, upon which "'[c]lasswide liability could be established . . . if [plaintiff] were able to demonstrate that, for example, Brinker under this uniform policy refused to authorize and permit a second rest break for employees working shifts longer than six, but shorter than eight, hours.'"[15]  Although the Court acknowledged that there was some evidence that (paraphrasing Autozone), they "do not really follow" their own rest break policy, the Court noted that "'courts' discomfort with individualized liability issues is assuaged in large part where the plaintiff points to a specific company-wide policy or practice that allegedly gives rise to consistent liability.'"  <u>Id.</u> at 10, 13 (quoting <u>Kurihara</u>, 2007 U.S. Dist. LEXIS 64224, at *6).

The Court addressed Autozone's argument that the case would not be manageable, stating, "If . . . the Court believed that it would need to make endless individualized inquiries about whether and how often putative class members got rest breaks, and all of the different reasons why rest breaks did not occur, it would agree with Defendant that the case was unmanageable."  <u>Id.</u> at 15.  Indeed, at the motion hearing, the Court had commented: "Seems to me it's going to be a nightmare," and asked Plaintiffs: "How are you going to do it?  I just don't know.  How are you going to do it?  I mean, I've got to tell you: no records.  Recollections, . . They are going to get some money, if in fact they seem to recall eight years ago not getting a break on a particular day."  Tr. of 12/14/2012 (dkt. 173) at 24.  The Court reasoned in its order, though, that "Autozone's liability will be based on whether its rest

---

[15] Again, <u>Brinker</u>, 53 Cal. 4th at 1029, clarified that under the Wage Order, "[e]mployees are entitled to 10 minutes' rest for shifts from three and one-half to six hours in length, 20 minutes for shifts of more than six hours up to 10 hours, 30 minutes for shifts of more than 10 hours up to 14 hours, and so on."

United States District Court
For the Northern District of California

break policy violates the law or not—the policy is a fact common to all class members," and that "Plaintiffs' counsel argued at the motion hearing that there might well be records that would render the case more manageable." Order re Class Cert. at 16.[16] The Court specifically referenced Plaintiffs' counsel's representation that Autozone "conducted audits of its rest breaks,"[17] and concluded, "[w]hether this would work or would ultimately prove impractical remains to be seen, but the Court is willing to let Plaintiffs proceed." Id. at 16.

Autozone now moves to decertify the class. Although there are numerous bases for Autozone's motion, two facts stand out as substantially different than the Court understood them to be at class certification.

First, as discussed above with reference to Plaintiffs' summary judgment motion, the policy with the unlawful language about rest breaks was not in place throughout the class period. At the beginning of the class period, in July 2005, Autozone's 2004 California Store Handbook was in effect, and it provided that "[rest] breaks are scheduled in accordance with California law." See Opp'n to P MSJ at 2 (citing 2012 Jon Decl. ¶ 8, Ex. A; 2016 Jon Decl. ¶ 3, Ex. A). In addition, the Wage Order with the "major fraction thereof" language was posted in each store. Id. (citing 2016 Jon Decl. ¶¶ 6–7; Stephens Decl. ¶¶ 3–4; Iskander

---

[16] At the motion hearing, Plaintiffs' counsel initially stated, "there are records in this case" to "demonstrate the universe of people to which the violation could have occurred," and the Court responded: "We're not talking about those records. . . . we're talking about the record of somebody not getting a break. And that's the record—that's the record that doesn't exist." Tr. of 12/14/2012 at 23. Plaintiffs' counsel responded: "I don't think that's true. I think there could be evidence of rest breaks that we haven't obtained yet." Id. at 25.

[17] At the motion hearing, Plaintiff's counsel stated: "in fact, the Defendant conducted audits of rest breaks. . . . Now, we haven't gotten them all, but they had a plan, an audit system in place where they looked at this very issue. They apparently believed that we could determine whether or not there was rest break response or there was rest break compliance. They undertook a policy . . . to do that very thing." Id. at 26.

United States District Court
For the Northern District of California

Decl. ¶ 3, Ex. 2.  Autozone revised its handbook in 2006, and the revised handbook again provided that "[rest] breaks are scheduled in accordance with California law."  Id. (citing 2012 Jon Decl. ¶ 8, Ex. A; 2016 Jon Decl. ¶ 3, Ex. A).  Wage orders continued to be posted in each store.  Id. (citing 2016 Jon Decl. ¶¶ 6–7; Stephens Decl. ¶¶ 3–4; Iskander Decl. ¶ 3, Ex. 2).  The unlawful language from the 2008 "Store Handbook Exception, California" was not implemented until 2008.  See Opp'n to P MSJ at 3 (citing 2016 Jon Decl. ¶ 4, Ex. B; 2012 Jon Decl. ¶ 8, Ex. A).

Second, contrary to Plaintiffs' counsel's representations at the class certification hearing, there are no audit records or any other time records of when class members took rest breaks.  See Mot. to Decertify at 5 (citing Stephens Depo. at 41); Opp'n to Mot. to Decertify (dkt. 310) at 1 (citing Theriault Decl. ¶ 2 ("these documents were not useful to the analysis of when rest breaks were taken")).

Both developments impact this Court's view of certification.

### 2.    Legal Standard

A federal court's order granting class certification is subject to later modification.  See Fed. R. Civ. P. 23(c)(1)(C); Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147 (1982).  The standard of review is the same as a motion for class certification: whether the Rule 23 requirements are met.  See O'Connor v. Boeing N. Am., Inc., 197 F.R.D. 404, 410 (C.D. Cal. 2000).  Courts are expected to engage in a "rigorous analysis" to determine if Rule 23 has been satisfied.  Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350–51 (2011).  Because parties should be able to rely on a certification order, "in the normal course of events it will not be altered except for good cause," such as "discovery of new facts or changes in the

United States District Court
For the Northern District of California

parties or in the substantive or procedural law."  O'Connor, 197 F.R.D. at 409–10.  The party

seeking decertification bears the burden of demonstrating that the elements of Rule 23 have

not been established.  Weigele v. FedEx Ground Package Sys., 267 F.R.D. 614, 617 (S.D.

Cal. 2010).

### 3.    Discussion of Motion to Decertify

This order addresses Autozone's two challenges to certification: (a) predominance and

(b) manageability.

### a.    Predominance

Rule 23(b)(3) requires that "questions of law or fact common to class members

predominate over any questions affecting only individual members."  The Court previously

found this element met, noting that "[o]ther cases have likewise held that claims based on a

uniform policy are entitled to class certification."  Order re Class Cert. at 13 (citing Brinker,

53 Cal. 4th at 1020; Vegachalam, 2012 U.S. Dist. LEXIS 46429, at *37–39; In re Taco Bell

Wage & Hour Actions, 2012 WL 5932833, at *6).

Autozone argues that Plaintiffs cannot meet the predominance requirement of Rule

23(b)(3) because it is now clear that there was not one uniform policy in place throughout the

class period, that many class members received rest breaks, that there were varied reasons

why class members did not receive rest breaks, and that some class members chose not to

take rest breaks.  See Mot. to Decertify at 10–14.[18]

---

[18] Autozone also argues that Plaintiffs cannot meet the preponderance requirement because
damages cannot be attributed to Plaintiffs' theory of liability, as required by Comcast Corp. v. Behrend,
133 S. Ct. 1426, 1431, 1435 (2013) (denying certification in antitrust case where plaintiffs relied on
regression model that "did not isolate damages resulting from any one theory of antitrust impact.").
Mot. to Decertify at 15; Reply re Mot. to Decertify at 9.  But the Ninth Circuit explained in Vaquero v.
Ashley Furniture Indus., Inc., No. 13-56606, 2016 WL 3190862, at *3 (June 8, 2016), that, "[i]n a wage

United States District Court
For the Northern District of California

Of these arguments, the argument as to the uniform policy is the most significant.  It is doubtful that the Court would have certified the class in 2012 had it understood that Autozone did not have a single uniform policy in place throughout the class period.  <u>Brinker</u>, 53 Cal. 4th at 1033, held: "Claims alleging that a uniform policy consistently applied to a group of employees is in violation of the wage and hour laws are of the sort routinely, and properly, found suitable for class treatment."  It now appears that Autozone had a <u>lawful</u> written policy in place from 2005 to 2008 and that Autozone required the posting of the Wage Order with the "major fraction thereof" language in each store during this time.  <u>See</u> 2012 Jon Decl. ¶ 8, Ex. A; 2016 Jon Decl. ¶¶ 3, 6, 7, Ex. A; Stephens Decl. ¶¶ 3–4; Iskander Decl. ¶ 3, Ex. 2.[19]  That does not mean that Autozone gave its employees appropriate rest breaks from 2005–2008, but it does mean that Plaintiffs cannot attribute missed rest breaks during that period to the written policy.  It is no longer accurate to say that this case involves "a uniform policy consistently applied" throughout the class period.  <u>See</u> <u>Brinker</u>, 53 Cal. 4th at 1033.

That Autozone's policy was lawful, as written, for three years of the class period requires the Court to seriously consider Autozone's assertion that, "[e]ven though the written rest period policy language changed" in 2008 to include the <u>Brinker</u>-like one-rest-break-per-

---

and hour case, unlike in an antitrust class action, the employer-defendant's actions <u>necessarily</u> caused the class members' injury.  Defendants either paid or did not pay their sales associates for work performed.  No other factor could have contributed to the alleged injury.  Therefore, even if the measure of damages proposed here is imperfect, it cannot be disputed that the damages (if they are proved) stemmed from <u>Defendant's</u> actions."  The court reiterated that "the need for individualized findings as to the amount of damages does not defeat class certification."  <u>Id.</u> (citing <u>Yokoyama v. Midland Nat. Life Ins. Co.</u>, 594 F.3d 1087,1094 (9th Cir. 2010)).  The predominance problem in this case is not that damages cannot be linked to Autozone.

[19] In fact, named Plaintiff Jimmy Ellison signed a variation of the lawful rest break policy in March 2004.  <u>See</u> Mot. to Decertify at 1 (citing 2016 Jon Decl. ¶ 6, Ex. B).

United States District Court
For the Northern District of California

four-hours-worked language, "the implementation of the policy did not." See Mot. to

Decertify at 1.[20]  Taking a fresh look, it is unclear what Autozone's rest break policy was

from 2008 forward.

On the one hand, Autozone Divisional Human Resources Manager Carlos Jon

declared that "it is the expectation that at California stores, AutoZoners will take rest breaks

every two hours," that rest break practices were "highly variable between stores," and that

"[i]t is the store manager's responsibility to establish rest break practices at the store level."

2012 Jon Decl. ¶ 9.  Jon clarified in 2016 that "[a]t all times it was my understanding that by

providing rest breaks every 2-hours, as was AutoZone's policy, that it was consistent with

California law." Supp. 2016 Jon Decl. ¶ 2 (emphasis added).  Jon also declared that

Autozone's policy was to continue to post the Wage Order in all stores, even after

implementing the 2008 language.  2016 Jon Decl. ¶ 6; see also Stephens Decl. ¶ 3 (policy to

post Wage Order in store from 2005 to present).

On the other hand, Autozone in July 2011 sent all California district and store

managers an email entitled "Break Period Update (CA Stores Only)," which included a

"Manager's Action Plan" that asked managers to (1) ensure that all employees who worked

for four or more hours are provided one break period of no less than ten minutes and (2)

ensure that all employees who work for eight or more hours are provided two break periods

---

[20]   The Court rejected Autozone's argument at the class certification stage that it "does not really
follow" its unlawful policy because the Court believed that "there is no dispute that there is a uniform
policy here." See Order re Class Cert. at 12.

of no less than ten minutes.  See Theriault Decl. Ex. F.[21]  And yet, in August 2011, Carlos Jon prepared a PowerPoint presentation that included "Autozone's understanding of the requirements under California law for rest breaks"—which appropriately stated that employees who worked 3.5 to 6 hours were to receive one rest break, while employees who worked 6 to 10 hours were to receive two.  See 2016 Jon Decl. ¶ 5, Ex. C; Supp. 2016 Jon Decl. ¶ 2 (clarifying that PowerPoint was from August 2011).

Plaintiffs point to the 2016 deposition testimony of Nancy Stephens, a Divisional Human Resource Manager from 2000 to 2008 and from 2010 to the present, that she was not aware of any changes made in the Autozone rest break policy from 2005 to the present, or in how it was implemented.  Opp'n to Mot. to Decertify at 4 (citing Theriault Decl. Ex. B at 18–19.  Stephens went on to state, "well, in 2012, we updated the policy.  But we made it clearer for our AutoZoners, with giving them examples of when rest periods should be taken."  Id. at 19.  Although Plaintiffs argue that this testimony belies Autozone's assertion that there were multiple policies during the class period, Opp'n to Mot. to Decertify at 4, it provides equal support for Autozone's position that whatever the language of the written policy, Autozone's unwritten policy was always to give breaks every two hours (after all, Plaintiffs do not contend that the 2012 policy, which Stephens suggested was not a real change in policy, was unlawful).

The Court also looks to evidence of Autozone's rest break practices.

---

[21] Plaintiffs also point to the deposition testimony of Azeem Sikander on rest periods, see Opp'n to Mot. to Decertify at 4, but the Court has already held that Sikander was not Autozone's person most knowledgeable on rest breaks and that his answers did not bind Autozone on that subject, see Order re Class Cert. at 7.

United States District Court
For the Northern District of California

There is evidence that some employees were allowed to take rest breaks in compliance with California law.  For example, named Plaintiff Doland declared that he only "sometimes" did not receive a second rest break, Doland Decl. (dkt. 95-7) ¶ 9, although he also testified that he received a 10-minute smoke break "a couple times a shift," Iskander Decl. ¶ 4, Ex. 3 at 77.  Although some class members testified that they never received a break, see, e.g., id. ¶ 5, Ex. 4, others testified that they took breaks or told their subordinates to take breaks every two hours, id. ¶¶ 6–7, Ex. 5 at 24–25 (took rest breaks every couple hours), Ex. 6 at 17, 23 (tell employees entitled to breaks every two hours).  Others testified that it depended on the manager, position held, hours scheduled, and/or store staffing levels.  See id. ¶¶ 8–9, 11, Ex. 7 at 39 (store manager would tell you; if busy, you had to stay at counter); Ex. 8 at 40 (did not take break when too busy, no one told her that she could not take a break; when on remodeling crew, got breaks); Ex. 10 at 39 (only took breaks when manager authorized).  Autozone points to declarations from 117 class members stating that they knew they were authorized and permitted to take first and second rest breaks if they worked three-and-a-half or six hour shifts.  See Mot. to Decertify at 8 (citing Opp'n to Mot. to Certify (dkt. 121) (citing Waggoner Decl. (dkt. 122) Ex. B)).

Some employees testified to more generous policies.  One declarant testified that he was authorized and permitted to take a 10-minute break every two hours.  See Arreola Decl. (dkt. 133-2) ¶ 9; see also Beltran Decl. (dkt. 134-1) ¶ 8 ("In terms of taking rest breaks, our team sometimes refers to it as the '2-4-6,' meaning that we generally take the first rest break about two hours into the shift, then lunch around the 4 hour mark, and then the second break around six hours into the shift."); Cisneros Decl. (dkt. 136) ("[w]henever I am scheduled to

work a shift of 6 hours or more, I know that I can take a second paid rest break of 10

minutes."); Baylon Decl. (dkt. 134-1) ¶ 6 (one 10 minute rest break no matter how few hours

worked and a second 10 minute rest break if more than five hours); Velasquez Decl. (dkt.

145-2) ¶ 7 (rest break on any shift longer than 2 hours, second rest break on shift longer than

6 hours, but often chose to forego breaks); Smith Decl. (dkt. 144-2) ¶ 3 (employees often

take more than two breaks).

Even Plaintiffs' survey, which this order discusses below in the context of

manageability, does not confirm that there was a common practice of denying rest breaks.  It

shows that of respondents who worked Short Shifts (shifts of 3.5 to 4 hours), 25% stated that

they were not authorized and permitted to take a rest break during short shifts, 58% said that

they were authorized and permitted, and 16% said that they did not know or could not

remember.  Saad Decl. in Opp'n to P MSJ (dkt. 300-1) ¶ 3.  Of respondents who worked Mid

Shifts (shifts of 6 to 8 hours), 29% stated that they were not authorized and permitted to take

two rest breaks during mid-shifts, 53% said that they were authorized and permitted, and

17% stated that they did not know or remember.  Id.  Of respondents who worked Long

Shifts (shifts of between 10 and 12 hours), 38% stated that they were not authorized and

permitted to take three rest breaks during long shifts, 25% said that they were authorized and

permitted, and 38% stated that they did not know or remember.  Id.  Additionally, 48% of the

respondents stated that they took their rest breaks 75% of the time during Short Shifts, 57%

said that they took their rest breaks 75% or more of the time during Mid Shifts, and 51% said

that they took their rest breaks 75% or more of the time during Long Shifts.  Id. ¶ 4.  If

Autozone had a uniform policy or practice of disallowing rest breaks for these shifts

throughout the class period, the Court might expect that the rate of respondents who stated

that they were "not authorized and permitted" to take rest breaks, or who did not take rest

breaks, would be higher.

Because Autozone did not have a uniform written policy in place throughout the class

period and because the evidence of employee rest break practices does not reflect a

consistent rest break practice, the cases Plaintiffs cite about uniform policies do not apply.

See Opp'n to Mot. to Decertify at 5 (citing Faulkinbury, 216 Cal. App. 4th at 235

("employer's liability arises by adopting a uniform policy that violates the wage and hour

laws"); Benton, 220 Cal. App. 4th at 726 (same); Abdullah v. U.S. Sec. Assocs. Inc., 731

F.3d 952, 962 (9th Cir. 2013) (adopting Faulkinbury language re potential liability); Brewer,

2015 WL 9460198, at *2 (explaining that it would be error to focus on whether some

individuals were able to take breaks because "liability arises by adopting a uniform policy

that violates the wage and hour laws"); McCowen v. Trimac Transp. Servs. (W.), 311 F.R.D.

579 (N.D. Cal. 2015) ("policies and practices [plaintiff] targets appear to have applied

company-wide"); Scott-George v. PVH Corp., No. 2:13-CV-00441-TLN-DAD, 2015 U.S.

Dist. LEXIS 157410, at *26 (E.D. Cal. Nov. 20, 2015) ("all eight Subclasses are based on

Defendant's uniform policies and practices"); Tapia v. Zale Del., No. 13-cv-1565-BAS

(PCL), 2016 U.S. Dist. LEXIS 48046, at *7-8 (S.D. Cal. April 6, 2016) ("uniform payroll

policy and practice"); Saechao v. Landry's Inc., No. 15-815 WHA, 2016 U.S. Dist. LEXIS

33409, at *17–19 (N.D. Cal. Mar. 15, 2016) (describing "uniform practice regarding rest

breaks" that put onus on employees to take breaks, holding that "her rest-break class relies on

a facial challenge to [employer's] practice, which is a legal question plainly capable of class-

United States District Court
For the Northern District of California

wide resolution")).

This case is more akin to cases in which courts have denied certification (or decertified) because they found that there is not a uniform policy consistently applied.  See, e.g., Ochoa v. McDonald's Corp., No. 3:14-CV-02098-JD, 2016 WL 3648550, at *6 (N.D. Cal. July 7, 2016) ("for a class to be certified for claims under these laws, the evidence would typically need to show that crew members were denied meals and rest breaks by the application of a uniform policy, or by a consistent and widespread practice in the workplace, even if not memorialized in any formal fashion"); Cole. v. CRST, Inc., No. EDCV 08-1570-VAP (SPx), 2016 U.S. Dist. LEXIS 48940, at *7 (C.D. Cal. April 1, 2016) ("Plaintiff must show that Defendant had a general policy of preventing its drivers from taking meal and rest breaks.  Plaintiff has not made this showing because a number of drivers, including Plaintiff, acknowledge that they took meal and rest breaks when needed. . . ."); and Ordonez v. Radio Shack, Inc., No. CV 10-7060-CAS (JCGx), 2013 U.S. Dist. LEXIS 7868, at *21–22 (C.D. Cal. Jan. 17, 2013) ("plaintiff has not carried his burden of demonstrating that a uniform corporate policy denying employees the opportunity to take meal breaks could be proven on a classwide basis.  Plaintiff's evidence of such a policy (or policies), taken as a whole, is simply insufficient to warrant class certification here").

Because there was no single uniform written policy in place from 2005 to 2012, nor a consistent practice of denying rest breaks during that time, Plaintiffs have failed to demonstrate that "questions of law or fact common to class members predominate over any

questions affecting only individual members." See Fed. R. Civ. P. 23(b)(3).[22]

### b.     Manageability (Superiority)

In addition to predominance, Rule 23(b)(3) requires a court to find that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Pertinent to that determination are "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D).  The Court previously found this element met, commenting that "Defendant does raise legitimate concerns about manageability" but ultimately concluding that "Plaintiffs have convinced the Court, for now" that the case would be manageable. Order re Class Cert. at 15–16.  Specifically, the Court understood that "AutoZone's liability will be based on whether its rest break policy violates the law or does not" and that "there might well be records that would render the case more manageable." Id. at 16.

Autozone argues that Plaintiffs cannot meet the manageability requirement of Rule 23(b)(3) because there are no rest break records or audits, and because Plaintiffs' proffered

---

[22] Plaintiffs argue for the first time in their opposition brief that Autozone's "lack of any policy, procedure or mechanism to pay rest break premiums . . . is also sufficient to support certification." Opp'n to Mot. to Decertify at 5–6.  The Court does not know what "sufficient to support" means—it certainly cannot mean that it is sufficient in and of itself.  Plaintiffs point to the testimony of Autozone corporate designee Mark Dessem, who "did not know " if employees received premiums if they missed rest breaks, and Autozone designee Stephens, who testified that she is not aware of any rest break premiums having been paid (although she also stated that the way to determine if any were paid was "to talk to each store manager and ask them how they implemented that"). Id. (citing Theriault Decl. Ex. I at 56; Theriault Decl. Ex. C at 17–18).  Plaintiffs overreach.  The cases they cite, id. at 6, relate to claims of employers not paying premium wages for missed breaks. See Safeway, Inc. v. Super. Ct. of L.A. Cnty., 238 Cal. App. 4th 1138, 1155 (2015) (case pertained to failure to pay premium wages); Amaro v. Gerawan Farming, Inc., No. 1:14-CV-00147-DAD-SAB, 2016 U.S. Dist. LEXIS 66842, at *26–27 (E.D. Cal. May 20, 2016) ("The issue in this case is not the availability of rest breaks; plaintiffs and defendants agree that class members were offered, and free to take, rest breaks.  Rather, the issue is whether class members were properly compensated for these breaks."); Cervantez v. Celestica Corp., 253 F.R.D. 562, 573 (C.D. Cal. 2008) (claims relating to meal and rest period class directly relate to common policy re paying premium pay).  In our case, the Court did not certify a rest break premium class.  See Order re Class Cert. at 1 (certification denied "as to all other subclasses.").  Rest break premiums are relevant to damages—because employees who prevail on their rest break claims will be entitled to premiums—but do not assist Plaintiffs in establishing predominance on the rest break claim.

United States District Court
For the Northern District of California

survey cannot be used to establish liability.[23]  Plaintiffs downplay the importance of rest

break records and tout the merits of their survey.  The Court agrees with Autozone that the

case has become unmanageable.

### i.      No rest break records

Employers are not obligated to keep records of rest breaks.  See Washington v. Joe's

Crab Shack, 271 F.R.D. 629, 641 n.3 (N.D. Cal. 2010) (citing Cal. Code Regs. tit. 8,

§ 11070).  Because in this case there are no records of rest breaks, or audits, and there is no

uniform policy or practice forbidding appropriate rest breaks, assessing class members'

claims of lost rest breaks requires an individual analysis.  Id. ("[f]or this reason,

individualized analyses must be conducted to determine whether and when rest breaks were

not taken.").  Mini-trials of 20,000 class members would be unmanageable.[24]

Relevant to this issue is the Taco Bell litigation, which each side contends favors its

position.  See Opp'n to Mot. to Decertify at 7–8; Reply re Mot. to Decertify (dkt. 313) at 4.

In the November 27, 2012 Taco Bell order, the Eastern District found that the plaintiffs had

established commonality on a meal break subclass; the court noted that "Brinker did not . . .

require a store by store inquiry as to how the policy at issue was implemented in finding a

uniform, consistently applied policy.  Rather, the court cited a corporate policy that was

equally applicable to all employees."  In re Taco Bell Wage & Hour Actions, 2012 WL

---

[23] Autozone also argues that the survey cannot be used to establish damages, but the Court does not reach this issue.  The Ninth Circuit instructs that the need for individual damages calculations cannot defeat class certification.  See Leyva v. Medline Indus., Inc., 716 F.3d 510 (9th Cir. 2013) (observing that "damages determinations are individual in nearly all wage-and-hour class actions").

[24] The Court observes that Plaintiffs included nearly 500 names of trial witnesses on their Modified Third Supplemental Disclosures.  See Reply re Mot. to Decertify at 4.

United States District Court
For the Northern District of California

5932833, at *6.  The court in that same order noted that "[a]s with the meal break claim,
Plaintiffs contend that the rest period policy is facially invalid."  Id. at *10.  The court
explained, "[a]t first glance, it appears that this theory is similar to Plaintiffs' meal break
claim insofar as it is based on an allegedly facially invalid policy.  However, the differences
in time keeping requirements affect commonality and, to some extent, ascertainability and
numerosity."  Id. at *11 (emphasis added).  Because the state of California does not require
employers to record rest breaks, the court held that "[w]ithout reliable evidence in the time
cards, an individual inquiry is the only way to determine whether a second break was or was
not taken."  Id.  The court concluded that the rest break claim was "not suitable for class-
wide treatment."  Id.

Plaintiffs note in the present briefing that the rest break claims in Taco Bell were
"subsequently certified by the trial court on a motion for reconsideration."  Opp'n to Mot. to
Decertify at 7 (citing In re Taco Bell Wage & Hour Actions, E.D. Cal. Case No. 1:07-cv-
01314-SAB, ECF No. 510 at 12–13).  Plaintiffs' counsel, who represented the plaintiffs in
that case, assert that "the three certified claims in In re Taco Bell were tried to a jury in
February and March 2016, in 11 days."  Id. at 8; see also id. at viii (arguing that "theory of
liability and evidence" in Taco Bell was "remarkably similar to this case").  But Plaintiffs
omit the reason that the court reconsidered certification on the rest break claim.  The court
explained that it had "denied certification based upon Defendants' argument that the time
records were inaccurate with respect to rest breaks."  In re Taco Bell Wage & Hour Actions,
E.D. Case No. 1:07-cv-01314-SAB, ECF No. 510 at 10.  "Accepting Defendants' argument,
the Court determined that the Rest Break Subclass was unascertainable because it would be

31

impossible to determine membership of the class if there was no way to ascertain from the records which employees actually missed a rest break and which employees simply did not record their rest breaks." Id. at 11.  The Court reconsidered because, contrary to Defendants' earlier representation, "the record indicates that Defendants[] kept records of rest breaks irrespective of whether they were legally required to do so." Id.  The combination of (1) a uniform written policy and (2) time records of rest breaks meant that the rest break claims were amenable to class treatment. Id. at 13.

Our case is the reverse of Taco Bell.  Here, the Court certified a class when it believed that there were rest break records. See Order re Class Cert. at 16; Tr. of 12/14/2012 at 23–25 (representations by Plaintiffs' counsel that "there could be evidence of rest breaks").  It now turns out that such records do not exist.  Plaintiffs' argument that the records are irrelevant to liability and only speak to damages are unpersuasive: somehow Plaintiffs must demonstrate that Autozone is liable as to each class member.

### ii.     Plaintiff's survey

Plaintiffs suggest that their expert's survey—new since 2012—could bridge the evidentiary gap created by the absence of rest break records and help them establish liability.  Opp'n to Mot. to Decertify at 11–15.  It does not.  The survey fails Plaintiffs because it is not a proper use of representational evidence, and because its fundamental lack of scientific rigor makes it inadmissible.

As to the use of representational evidence in class actions, a pair of recent Supreme Court cases are instructive.  The Supreme Court in Dukes, 564 U.S. at 367, objected to the notion of "Trial by Formula" where the Court of Appeals had envisioned that

[a] sample set of the class members would be selected, as to whom liability for sex discrimination and the backpay owing as a result would be determined in depositions supervised by a master.  The percentage of claims determined to be valid would then be applied to the entire remaining class, and the number of (presumptively) valid claims thus derived would be multiplied by the average backpay award in the sample set to arrive at the entire class recovery—without further individualized proceedings.

The Court's objection was that such a process prevented the defendant from litigating its statutory defenses to individual claims.  Id.

The Court recently observed in Tyson Foods, Inc. v. Bouaphakeo, 136 S.Ct. 1036, 1046 (2016), that "[i]n many cases, a representative sample is 'the only practicable means to collect and present relevant data' establishing a defendant's liability."  It explained that the permissibility of such evidence does not turn on whether the case is an individual or class action: "[i]n a case where representative evidence is relevant in proving a plaintiff's individual claim, that evidence cannot be deemed improper merely because the claim is brought on behalf of a class."  Id.  In Tyson Foods, the representative evidence consisted of a study performed by an industrial relations expert who "conducted 744 videotaped observations and analyzed how long various donning and doffing activities took" in the three different departments of a meat processing facility.  Id. at 1043.  The expert then averaged the time taken in his observations to produce an estimate of 18 minutes per day for two departments and 21.25 minutes a day for a third department.  Id.  The Court explained that because "each class member could have relied on that sample to establish liability if he or she had brought an individual action," the expert's calculation of average donning and doffing times was also "a permissible means of making that very showing" in the class action.  Id. at 1046–47; see also Vaquero, 2016 WL 3190862, at *3–4 (discussing Dukes, Tyson Foods).

There is no question, then, that representational evidence can help plaintiffs establish liability in class actions.  The problem with the survey Plaintiffs seek to use here is that it is more like the representational evidence in <u>Dukes</u> than the representational evidence in <u>Tyson Foods</u>.  The representational evidence in <u>Tyson Foods</u> would have been appropriate for an individual class member to use in an individual action because an employee cannot travel back in time and record how long it took to put on her equipment each day; instead, the employee can hire an expert to generate an average time.  The representational evidence did not depend on individual employees' memories, it simply filled in a gap: there was a uniform policy "not to pay for those activities," and plaintiffs needed to establish "the amount of uncompensated work each employee did."  <u>See Tyson Foods</u>, 136 S.Ct. at 1042–44.  In contrast, the plaintiffs in <u>Dukes</u> sought to establish that a small number of employees had experienced sex discrimination, and then to extrapolate those results to the class as a whole.  <u>See Dukes</u>, 564 U.S. at 367.  But an employee bringing an individual action would not have been able to rely on another employee's sex discrimination to establish her own claim.  Similarly here, an Autozone employee in an individual action would not be able to point to other employees' varied experiences of when they were allowed rest breaks and how often they took rest breaks in order to establish her own claim for missed rest breaks, particularly in the absence of a uniform policy.  This would unfairly deny Autozone the right to litigate individual issues of liability.  As Judge Spero recently explained in <u>Senne v. Kansas City Royals Baseball Corp.</u>, Case No. 14-cv-608-JCS, Order re Class Cert. (dkt. 687) at 91:

> Rather than merely filling in "evidentiary gaps" in a situation where all of the employees were similarly affected by a uniform policy, Plaintiffs here are attempting to paper over significant material variations that make application of

34

> the survey results to the class as a whole improper.  Allowing Plaintiffs to rely
> on the survey evidence . . . would be inappropriate under the circumstances
> here because doing so would enlarge the rights or Plaintiffs and deprive
> Defendants of the right to litigate the individual issues. . . .

The survey is not an appropriate use of representational evidence.

As to the survey's admissibility, the Court looks first to Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  See Fed. R. Evid. 702 (allowing expert testimony only if: "expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; the testimony is based on sufficient facts or data; the testimony is the product of reliable principles and methods; and the expert has reliably applied the principles and methods to the facts of the case"); Ellis v. Costco Wholesale Corp., 657 F.3d 970, 982 (9th Cir. 2011) ("Daubert does not require a court to admit or exclude evidence based on its persuasiveness; rather it requires a court to admit or exclude evidence based on its scientific reliability and relevance.").  "Evidence should be excluded as unreliable if it 'suffer[s] from serious methodological flaws.'"  Senne Order re Class Cert. at 96 (quoting Obrey v. Johnson, 400 F.3d 691, 696 (9th Cir. 2005)).  And evidence should be excluded as irrelevant if it does not "fit" the issue to be decided: "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes."  See Daubert, 509 U.S. at 591.

Alongside this guidance about expert evidence generally is the Ninth Circuit's guidance about surveys in particular.  "Survey evidence should be admitted 'as long as [it is] conducted according to accepted principles and [is] relevant.'"  See Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc., 618 F.3d 1025, 1036 (9th Cir. 2010).  The Ninth

United States District Court
For the Northern District of California

Circuit has explained that there are two steps in a district court's treatment of a survey.  See Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1263 (9th Cir. 2001).  First, the court is to determine admissibility: "is there a proper foundation for admissibility, and is it relevant and conducted according to accepted principles?"  Id.  Second, once the survey is admitted, "follow-on issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility."  Id.; see also Fortune Dynamic, 618 F.3d at 1036 ("'technical inadequacies' in a survey, 'including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility.'").  On the other hand, "substantial deficiencies in the design or execution of a survey of individuals is grounds for its complete exclusion."  See Gibson v. Cnty. of Riverside, 181 F. Supp. 2d 1057, 1067 (C.D. Cal. 2002); see also Sirko v. Int'l Bus. Machs. Corp., No. CV 13-03192 DMG (SSx), 2014 WL 4452699, at *4 (C.D. Cal. Sept. 3, 2014); Stonebrae, L.P. v. Toll Bros., Inc., No. C-08-0221 EMC, 2011 WL 1334444, at *4 (N.D. Cal. Apr. 7, 2011), aff'd, 521 F. App'x 592 (9th Cir. 2013) (emphasis added) ("so long as the data are reliable, methodological deficiencies" impact weight, not admissibility).

Although the Court is concerned about the relevance of Plaintiffs' survey—which Plaintiffs commissioned in order to help them establish damages, see Tr. of 12/14/2012 at 30, Wazzan Report ¶ 11[25]; Wazzan Depo. at 24, 140–43. 190–91, 242–45, and now try to use to

---

[25] "I was asked by Counsel to determine damages based on the assumption that no rest break was authorized and permitted for any Short Shift, Mid shift, or Long Shift.  I was also asked to determine damages based on the assumption that rest breaks actually taken were in fact authorized and permitted." Id.; see also id.¶ 12 ("I have also been asked by counsel for the plaintiffs to calculate damages associated with the following categories . . .").

establish liability, see Opp'n to Mot. to Decertify at 14 ("The Survey Addresses Relevant

Liability and Damages Questions to a Random Sample of the Relevant Population")— the

Court is more concerned that there are substantial deficiencies, and not mere quibbles about

methodology, that render it inadmissible.

First, Plaintiffs' survey had a woefully low response rate.  Out of a random sample of

10,000 individuals, Plaintiffs' expert Dr. Wazzan obtained 343 usable responses, Wazzan

Report ¶ 24, which is a response rate of 3.43%, Saad Decl. (dkt. 264-4) ¶ 4.  Even removing

the 4,320 "nonreachable" individuals from the total, the response rate would be 6.0%.  Id.

"In survey research, such low response rates are generally not considered adequate for being

able to generalize, or extrapolate the results of the survey to the wider population from which

the sampled group was drawn."  Id.  The California Supreme Court explained in Duran v.

U.S. Bank Nat. Ass'n, 59 Cal.4th 1, 42 (2014), that "[a] sample must be sufficiently large to

provide reliable information about the larger group."  The court found a sample size of 8%

inadequate.  Id. at 12, 42.  It explained that a small sample size might be "convenient and

manageable," but "the same could be said of a sample of one."  Id.  The sample size here is

smaller than the one judged inadequate in Duran.[26]  See also Senne, Order re Class Cert. at

98 (discussing "possibility" of non-response bias where response rate was 32.4%).  But see

Alcantar v. Hobart Serv., No. ED CV 11-1600 PSG (Spx), 2013 WL 15630, at *4 (C.D. Cal.

Jan. 15, 2013) (problems with response rate go to weight not admissibility).  The Central

District recently explained, in a case involving a survey with a 95% non-response rate, that,

---

[26] Plaintiffs complain in the opposition brief that the response rate is 6%, not 3.5%; either is lower than 8%.  See Opp'n to Mot. to Decertify at 15 n.7

United States District Court
For the Northern District of California

"Although . . . a survey's non-responsive rate generally goes to the weight of the results rather than their admissibility," where the offering party is unable "to validate that the survey was reliably designed and administered, such concerns reasonably suggest that the survey's methodology may be flawed."  See In re ConAgra Food, Inc., 90 F. Supp. 3d 919, 951 (C.D. Cal. 2015).

While it is possible that a survey with such a low response rate could nonetheless be reliable, see, e.g., Rodman v. Safeway Inc., 125 F. Supp. 3d 922, 937 (N.D. Cal. 2015), Plaintiffs' expert provides the Court with no assurance that his is.  Instead, he sweepingly concludes: "My calculation of the violation rates are derived entirely from survey responses made by class members who worked at least one shift that met any of the Short Shift, Mid Shift, or Long Shift criteria.  Therefore, I find it appropriate to extrapolate these results to the class as a whole."  Wazzan Report ¶ 28.  He offers no explanation of why the 343 responding class members adequately stand in for the class as a whole, simply because each worked at least one of the relevant shifts.  Autozone's expert explains that "it would be especially inappropriate to extrapolate" from the small response rate "without careful and extensive survey reliability analysis, neither of which is done to the requisite extent."  Saad Decl. ¶ 4. He continues: "No survey research professional would proceed as Dr. Wazzan has done and essentially assume, with little to no additional analyses, that such a sample was appropriate to support the conclusion that over 20,000 persons shared the experience of 3% or even 6% of the sampled group of 10,000."  Id.[27]

---

[27] Dr. Saad relies in part on The Reference Guide on Survey Research in Reference Manual on Scientific Evidence, which states that response rates below 75% should receive "greater scrutiny," those below 50% should be regarded with "significant caution," and that surveys with response rates of 5%

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

Second, a problem with the low response rate is that it "suggests that there is a nonresponse bias, which is a form of bias that can occur when particular systematic segments of the target population or sample do not provide responses to a survey." Id. Autozone's expert explains that "If those who do not respond are systematically different from those who do respond, the results will be biased and unreliable for making conclusions about the population as a whole." Id. He states that there is a type of non-response called selected non-response: "some of the persons called actively choose not to respond for particular reasons—that is, they self-select out of the survey." Id. ¶ 8. Dr. Wazzan encountered 572 individuals who refused to participate; refusals outnumbered surveys responded to by almost two-thirds. Id. ¶ 9. "This is a red flag in any survey, and especially one conducted in a litigation context." Id. If one does not know why the self-selection took place, then one cannot adjust for it. Id. ¶ 8.

Plaintiffs' expert did not adequately account for the possibility of nonresponse bias. See Medlock v. Taco Bell Corp., No. 1:07-cv-01314-SAB, 2015 WL 8479320, at *3 (E.D. Cal. Dec. 9, 2015) (discussing expert's efforts to test own survey's "reliability and validity by comparing survey respondents to the population and the initial sample to evaluate nonresponse error on a key characteristic measure" as well as "post survey testing comparing the consistency of answers").[28] Although he compared the number of days worked by

---

to 20% are "very unlikely" to "provide any credible statistics of the population as a whole." Id. ¶ 5.

[28] One way to make a survey more reliable is to do an adequate pre-test, but Plaintiffs' pre-test was inadequate. The first pre-test involved 50 individuals, only two of whom completed the survey. Id. ¶ 27. The second pre-test also involved 50 individuals, only three of whom responded. Id. This is a response rate of 5%, which is arguably higher than the survey itself. But it is "far too small a group to conduct relevant pre-test diagnostics," which should consist of testing "the survey instrument itself, and make sure that questions are clear, that terms are stated in language target respondents will understand, to make sure there is no confusion, and so on." Id.; see also York v. Starbucks Corp., No.

United States District Court
For the Northern District of California

respondents against non-respondents, "this adjustment is meaningless without understanding why respondents tended to have worked more days than non-respondents." Saad Decl. ¶ 11. Plaintiffs did not make the respondent data available to Autozone's expert, but Autozone's expert asserts that "the limited analysis I am able to perform already shows that the profiles between the two groups are different, and thus the respondents are not representative of the population as a whole." Id. ¶ 14. He states that "Dr. Wazzan has essentially assumed there is no non-response bias, which in the case of a 3% or 6% response rate, is simply not appropriate." Id. ¶ 16. "A survey that 'begins with a random sample,' but does not 'take measures to assure that the nonresponses are random and provide analysis of the reasons of nonresponse' is not 'the product of reliable principles and methods.'" Wallace v. Countrywide Home Loans Inc., No. SACV 08-1463-JST (MLGx), 2012 WL 11896333, at *4 (C.D. Cal. Aug. 31, 2012) (excluding survey under Daubert).

Third, there is also a problem of self-interest bias: "If the subject matter of a survey interests a potential respondent, they will be more inclined to respond. . . . it would be surprising if they did not make the connection between monetary gain and what their responses would be to a survey." Saad Decl. ¶ 15.[29] "'A sample that includes even a small number of interested parties can produce biased results.'" Trahan v. U.S. Bank Nat'l Ass'n, No. C 09-03111 JSW, 2014 WL 3750053, at *3 (N.D. Cal. July 28, 2014) (quoting Duran, 59

---

CV 08-07919 GAF (PJWx), 2011 WL 8199987, at *12 (C.D. Cal. Nov. 23, 2011) (striking as unreliable survey with numerous flaws, including failure to pre-test "to see how respondents may misunderstand the questions that were to be asked during the telephone interviews.").

[29] Put another way: "[h]earing that the nature of the survey relates to a class action lawsuit may bias the answers of the respondents if they feel that they may experience financial gain by participating and then responding in a certain way." Id. ¶ 29.

Cal. 4th at 43).  Autozone's expert explained, "[I]f a class member recalled always taking their rest breaks, they would infer that they were not entitled to any monetary award" and might be "less inclined to participate."  Saad Decl. ¶ 15.  On the other hand, a class member might have been more inclined to participate, and to provide answers suggesting labor violations, as the purpose of the survey was no mystery.  The survey included a phone script in which the surveyor stated: "Your contact information was obtained as part of a class action lawsuit involving individuals who worked at Autozone in the state of California between July 2005 and December 2012. . . . The information you provide will be used in connection with this lawsuit to help resolve it."  See Survey Layout (dkt. 264-4) at 18 of 71; see also Sirko, 2014 WL 4452699, at *4 ("The survey recipients had to have been aware they would be potential beneficiaries of such a lawsuit.  This undermines any possible inference that the survey responses were objective.  Because they survey lacks basic indicators of reliability, the Court finds it inadmissible."); Gibson, 181 F. Supp. 2d at 1068 ("More importantly, the recipients of the survey were informed of the purpose of the survey and reminded that they were the beneficiaries of the survey.  This is exactly the situation that the Pittsburgh Press court found so egregious."); Duran, 59 Cal. 4th at 43 ("[s]elf-interest may motivate class members to act in ways that will maximize the class award.").

Fourth, the survey asks respondents to recall very specific events that occurred between three and a half and eleven years ago.  See Senne Order re Class Cert. at 102[30];

---

[30] "The Court's concerns regarding possible self-interest bias are compounded by the problems identified by Defendants' expert arising from the heavy reliance in the Pilot Survey—and in any future survey—on the ability of the minor league players to remember the type of mundane events necessary to come up with reliable answers to questions about the amount of time they spent on various types of activities."  Id.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Duran, 59 Cal. 4th at 47 ("Witnesses' recollections of their past overtime were bound to be imprecise").  While class members might reliably remember whether they were "authorized and permitted" to take one/two/three rest breaks when they worked Short/Mid/Long shifts (although they might not if the policy was indeed in flux during the class period), some questions asked individuals to recall specific information they would have no way of recalling.  "[H]ow would a respondent be expected to accurately distinguish shift[s] that were 3 hours 35 minutes in length versus shifts that were 3 hours 25 minutes in length?"  Saad Decl. ¶ 20.  This is a real problem: when asked what percentage of his shifts between 3.5 and 4 hours contained an authorized rest break, respondent number 37 responded "About 75% of the time," though Autozone's expert demonstrates that this individual worked only one shift between 3.5 and 4 hours.  Id. ¶ 21.  In fact, of the 58 respondents who had only one shift between 10 and 12 hours, over 79% gave a response between 25% and 75%.  Id. ¶ 22.  Further evidence that respondents had trouble remembering is that some gave different answers in the survey than they did in depositions.  See, e.g., Mann Reply Decl. (dkt. 313-2) ¶ 5, Ex. 1; Iskander Reply Decl. ¶¶ 2–3, Ex. A–B (McCarl responded that he was authorized and permitted to take two rest breaks on Mid Shifts in the survey but at deposition did not recall; Zavala responded on the survey that he did not know if he received a handbook, but at deposition he responded that he had.).[31]

Fifth, the survey was imprecise.  It never clarified to respondents "that the questions only relate to the respondents' time as hourly, non-exempt employees," and swept at least

---

[31] Autozone also complains that the survey contains double hearsay.  Mot. to Decertify at 5; Reply re Mot. to Decertify at 4–5.  Plaintiffs have no response.

United States District Court
For the Northern District of California

one manager into the responses.  Id. ¶ 26.  The survey also finds that 64% of survey

respondents recalled receiving an employee handbook, but it is unclear which

handbook—the 2004 handbook with the lawful policy, the 2008 handbook with the unlawful

policy, or some other handbook.  See Wazzan Report ¶ 26 ("an employee handbook").   Nor

does the survey adequately address those employees who stated that they voluntarily chose

not to take rest breaks.  Saad Decl. ¶¶ 41–45 ("Had Dr. Wazzan asked respondents if they did

not take some rest breaks because they voluntarily chose not to, he would be able to more

accurately estimate which respondents chose not to take a rest break, versus those who claim

they were not authorized and permitted to take one.").[32]

These problems with the survey are fundamental and demonstrate that it is an

unreliable means of measuring Autozone's potential liability to individual employees.  The

Court therefore excludes it under Rule 702 and Daubert.  Without any rest break records and

without appropriate representational evidence, Plaintiffs will need to call each class member

into court to testify, a situation the Court previously described as "a nightmare."  See Tr. of

12/14/2012 at 24.  Because Plaintiffs have not identified a viable method to proceed, the case

is unmanageable and class treatment is not superior under Rule 23(b)(3).  See Ordonez, 2014

WL 4180958, at *6 ("substantial manageability problems remain" where "Plaintiff has not

proffered a viable method of determining when (or if) a particular employee took a rest break

on a particular day, short of obtaining testimony regarding each Radioshack store and each

---

[32] Autozone also notes a lack of clarity in a number of the questions.  See Reply re Mot. to
Decertify at 6 (asserting that "Plaintiffs' counsel objected to many of the survey questions in
deposition[s] as vague, ambiguous, and speculation."); see, e.g., Iskander Reply Decl. (dkt. 313-1) Ex.
A (Zavala Depo.) at 37 ("Q. On shifts you worked longer than three and a half hours, but shorter than
four hours, were you authorized and permitted to take at least one rest break?  Mr. Meneses: I'm going
to object.  Vague.  Calls for speculation.").

Radioshack employee.  The parties agree that rest breaks were not recorded. . . .")

Because Plaintiffs have failed to demonstrate predominance or manageability/superiority, the Court GRANTS the motion to decertify the class.

**C.      Motion to Remand Lozacruz Case**

Finally, Plaintiff Jesus Lozacruz moves to remand his case to state court following Autozone's removal, on diversity grounds, in January of this year.  See Mot. to Remand at 3. Lozacruz's argument is simple: his is a PAGA case, and not a class action, and therefore there is no diversity jurisdiction.  Id. at 2–3.  Autozone counters by arguing that Lozacruz is incorrect: his complaint does not plead a PAGA case, but "ten causes of action for alleged wage losses and unreimbursed expenses" and PAGA penalties are just one of the remedies he seeks.  See Opp'n to Mot. to Remand (dkt. 316) at 1.  Autozone is incorrect.

Lozacruz's complaint repeatedly and unmistakably identifies itself as a PAGA complaint.  See generally Pantel Decl. (dkt. 309-1) Ex. A (hereinafter "Lozacruz Compl."). This begins on its face.  See id. at 2 (caption reads: "Enforcement Action Under the Private Attorneys General Act, California Labor Code §§ 2698 et seq."; Plaintiff is listed in the caption as "Jesus Lozacruz, as an aggrieved employee pursuant to the Private Attorneys General Act ('PAGA')").  The complaint begins, "Plaintiff, acting in the public interest as a private attorney general pursuant to California Labor Code sections 2699(a), 2699.3, 2699.5 and 558. . . ."  Id. at 1.  It also states: "This is an enforcement action under the Labor Code Private Attorneys General Act of 2004, California Labor Code section 2698 et seq. ('PAGA') to recover civil penalties, and all other available relief on behalf of Plaintiff, the State of California, and all persons that are or were employed by Defendants," whom the complaint

United States District Court
For the Northern District of California

identifies as "aggrieved employees."  Id.[33]  The complaint includes the diversity-defeating

arguments that Lozacruz makes now (that there is no complete diversity because the State of

California is the real party in interest, and that under Urbino v. Orkin Servs. of Cal., 726 F.3d

1118, 1123 (9th Cir. 2013), civil penalties cannot be aggregated to satisfy the amount in

controversy requirement).  Id. at 1.  It includes numerous paragraphs about the applicability

of PAGA, Lozacruz's status as an aggrieved employee, and his satisfying of administrative

remedies to bring a PAGA claim.  See Pantel Decl. Ex. A ¶¶ 29–38.

Autozone's contention that the complaint does not only seek PAGA remedies (and is

therefore not purely a PAGA complaint) is based on paragraph 38, which reads:

> AUTOZONE, and others acting on its behalf, . . . have violated numerous
> provisions of the Labor Code, including the sections regulating hours and days
> of work, and the applicable Wage Order of the IWC.  Accordingly, Plaintiff
> seeks the remedies set forth in Labor Code section 558 for himself, the State of
> California and all aggrieved employees.  Specifically, pursuant to PAGA, and
> in particular California Labor Code sections 2699(a), 2699.3, 2699.5 and 558,
> Plaintiff, acting in the public interest as a private attorney general, seeks
> assessment and collection of civil penalties for himself, all aggrieved
> employees, and the State of California against AUTOZONE, in addition to
> other remedies, for violations of California Labor Code sections 201, 202, 203,
> 204, 226(a), 226.7, 450, 510, 512(a), 1174(d), 1182.12, 1194, 1197, 1197.1,
> 1198, and 2802.

Id. ¶ 38.  Autozone latches on to the "in addition to other remedies" language and argues that

"wages are 'remedies'" for violation of many of the statutes the complaint lists—and so

Lozacruz must be seeking wages.  Opp'n to Mot. to Remand at 1–2.  Although the "in

addition to other remedies" language is somewhat ambiguous, and echoed elsewhere, see,

e.g., Lozacruz Compl. ¶ 1 ("and all other available relief"); ¶ 35 ("in addition to other

---

[33] "Aggrieved employee" is a PAGA term.  See Cal. Lab. Code § 2699(c).

United States District Court
For the Northern District of California

remedies"),[34] and at 23 (Prayer for Relief, seeking "civil penalties, costs, and attorneys' fees .

. . and such other and further relief as the Court may deem equitable and appropriate,"), there

is simply no way to read the complaint as seeking such wages.

Although the sections that Autozone identifies indeed provide for wage remedies, the

complaint does not seek wages in its discussion of each section. See, e.g., Lozacruz Compl.

¶¶ 60, 69 (no wages sought in reference to § 226.7); id. ¶ 74 (no wages sought in reference to

§ 203); ¶ 48 (no wages sought in reference to § 510); ¶ 51 (no wages sought in reference to

§ 1194). Autozone argues that this is not controlling—that under California law, the court

"may grant the plaintiff any relief consistent with the case made by the complaint and

embraced within the issue," see Opp'n to Mot. to Remand at 14 (citing Cal. Code. Civ. P.

§ 580;[35] Wozniak v. Lucutz, 102 Cal. App. 4th 1031, 1044 (2002),[36] disapproved on other

grounds by Even Zohar Const. & Remodeling, Inc. v. Bellaire Townhouses, LLC, 61 Cal. 4th

830, 844 (2015); American Motorists Ins. Co. v. Cowan, 127 Cal. App. 3d 875, 883

---

[34]   The complete sentence in paragraph 35 is: "Thus, Plaintiff has satisfied the administrative prerequisites under California Labor Code section 2699.3(a) to recover civil penalties and unpaid wages against Defendants pursuant to California Labor Code §§ 2698 et seq. and 558, in addition to other remedies, for violations of California Labor Code § 201, 202, 203, 204, 226(a), 226.7, 450, 510, 512(a), 1174(d), 1182.12, 1194, 1197, 1197.1, 1198, 2802." Id. Although that sentence actually includes the words "and unpaid wages," the context is Lozacruz's assertion that he has satisfied the administrative prerequisites under section 2699.3(a) ("Requirements for aggrieved employee to commence a civil action" under PAGA). See Lozacruz Compl. ¶ 35; Cal. Lab. Code § 2699.3(a).

[35] Cal. Code Civ. P. § 580(a) reads: "The relief granted to the plaintiff, if there is no answer, cannot exceed that demanded in the complaint. . . but in any other case, the court may grant the plaintiff any relief consistent with the case made by the complaint and embraced within the issue."

[36]   That case actually held that the defendant "had a right to rely on the pleading limiting the amount of damages," and "had a right to rely upon the provisions of [section 580(b)(1)], which provides that in a limited civil case, relief may not be granted which exceeds the maximum amount in controversy for a limited civil case." Id. This does not support Autozone's argument that—notwithstanding the complaint here—Lozacruz might end up recovering unpaid wages he does not seek. See Opp'n to Mot. to Remand at 14.

(1982)).[37]  But that authority does not support the notion that a court could award a plaintiff unpaid wages if it understood his complaint to only seek remedies under PAGA.  See Achal v. Gate Gourmet, Inc., 114 F. Supp. 3d 781, 805 (N.D. Cal. 2015) (explaining that a prevailing plaintiff in a PAGA case is statutorily entitled only to 25% of civil penalties recovered).  Lozacruz explains that the reason he included the underlying Labor Code violations in his complaint was to show that he is aggrieved and has standing to sue.  Mot. to Remand at 4.  Indeed, how else could one advance a PAGA action?  Moreover, Lozacruz explicitly states in his briefing that he "does not seek individual damages or restitution for himself.  The operative complaint seeks only civil penalties on behalf of the State of California pursuant to [PAGA]."  Mot. to Remand at 2.  Although Autozone complains that "Plaintiff did not file a declaration or any evidence with this Motion disclaiming an interest in recovering wages," Opp'n to Mot. to Remand at 2, neither does Autozone point to any requirement that Lozacruz do so.

Given that this is a PAGA case, and that Lozacruz does not seek statutory damages based on the alleged underlying Labor Code violations, his case does not nearly meet the $75,000 diversity threshold.  In his Reply, Lozacruz spells out that he is seeking:

1.    $3,750 total civil penalties relating to the underlying labor code violations re overtime wages;
2.    $3,750 total civil penalties relating to the underlying labor code

---

[37] That case held: "it is fundamental that after trial on the merits, the court may afford any form of relief supported by the evidence and as to which the parties were on notice, whether requested in the pleadings or not. . . . [Defendant] had ample notice prior to trial that [Plaintiff] sought the imposition of a resulting or constructive trust upon the proceeds of the settlement.  The stipulation signed by counsel for all parties approximately two months before trial expressly stated that American Motorists desired relief by way of a constructive trust on the settlement proceeds."  Id.  (emphasis added).  American Motorists is therefore distinguishable from the present case, where—given the explicit statements in the complaint and in the briefing on this motion—Autozone would not be on notice that Lozacruz intended to recover unpaid wages as a result of the alleged Labor Code violations.

United States District Court
For the Northern District of California

violations re off-the-clock wages;

3.    $3,750 total civil penalties related to the underlying labor code violations re meal periods;

4.    $3,750 total civil penalties related to the underlying labor code violations re rest breaks;

5.    $150 total civil penalties related to the underlying labor code violations re Late Wages at Separation;

6.    $16,014 total civil penalties related to the underlying labor code violations re Late Wages During Employment;

7.    $5,000 penalties relating to wage statements;

8.    $2,500 civil penalties relating to reporting time pay;

9.    $2,500 civil penalties relating to business expenses;

10.    $2,500 civil penalties relating to forced patronage;

11.    Attorneys' Fees of $30,000.

See Reply re Mot. to Remand (dkt. 318) at 6–7. That number adds up to $73,664. Lozacruz hastens to point out, however, that he is not entitled to the total civil penalties, but only to 25% of them. Id. (citing Cal. Lab. Code § 2699(I) (aggrieved employee entitled to 25%)). Moreover, under Urbino, 726 F.3d at 1122, PAGA penalties cannot be aggregated to meet the amount in controversy requirement. Lozacruz's 25% share of the $43,664 in civil penalties amounts to $10,916. See Millar v. Bank of America, N.A., No. 3:15-cv-03320-LB, 2015 WL 5698744, at *3, 5 (N.D. Cal. Sept. 29, 2015) (recognizing that weight of authority in this district "considers only the named plaintiff's PAGA penalties when determining the amount in controversy"). The total amount in controversy in Lozacruz's case is therefore $10,916 (amounting to Lozacruz's 25% of civil penalties under PAGA) plus $30,000 in attorneys' fees, or $40,916—well below the $75,000 diversity threshold.[38]

The Court holds that Autozone has not met its burden of establishing that removal was proper, see Gaus v. Miles, Inc., 980 F.2d 564, 566–67 (9th Cir. 1992) (noting also "'strong

---

[38] Because the Court holds that the amount in controversy requirement is not met, it does not reach the question of complete diversity.

48

presumption' against removal jurisdiction"), and GRANTS the motion to remand the Lozacruz case.

## II.    CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiffs' Motion for Partial Summary Judgment; GRANTS Autozone's Partial Motion for Summary Judgment as to the PAGA claims, the section 558 penalties, and the prejudgment interest under section 218.6; DENIES Autozone's Partial Motion for Summary Judgment as to section 203; DENIES Plaintiffs' motion to strike; DENIES AS MOOT Autozone's motion to strike; GRANTS Autozone's motion to decertify; and GRANTS Plaintiff Lozacruz's motion to remand his case only.

**IT IS SO ORDERED.**

Dated: August 10, 2016



HON. CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

49